# In the United States Court of Federal Claims

No. 23-766T

(Filed:  December 5, 2024)

| | |
|---|---|
| **PAUL BRUYEA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

*Stuart E. Horwich*, Horwich Law LLP, London, United Kingdom, and *Max Reed*, Polaris Tax Counsel, Vancouver, British Columbia, Canada, for Plaintiff.

*Jason Bergmann*, United States Department of Justice, Tax Division, Washington, D.C., for Defendant.  With him on the briefs were *David I. Pincus*, Chief, Court of Federal Claims Section, *Mary M. Abate*, Assistant Chief, and *David A. Hubbert*, Deputy Assistant Attorney General.

## OPINION AND ORDER

Plaintiff, Mr. Paul Bruyea, claims that he overpaid his 2015 taxes by approximately $263,523, and therefore is entitled to a tax refund of that amount from the United States. Mr. Bruyea asserts he is owed the claimed refund once a treaty-based foreign tax credit is properly applied against the Net Investment Income Tax ("NIIT") he paid to the United States. Although Mr. Bruyea acknowledges that the Internal Revenue Code does not by its terms provide for such a foreign tax credit, he argues that a tax treaty between the United States and Canada independently entitles him to the claimed credit and, thus, the refund. This case turns on the proper interpretation of that tax treaty and how it fits with the text and structure of the Internal Revenue Code.

The interpretative puzzle is complicated but ultimately Mr. Bruyea's approach makes more sense of the relevant legal data.  This Court thus agrees with Mr. Bruyea that he is entitled to the foreign tax credit he claims.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

"All American citizens are subject to U.S. taxes, regardless of where they live or earn their income.  Citizens living and working abroad must therefore report their foreign-source income to the Internal Revenue Service." *Kappus v. Comm'r*, 337 F.3d 1053, 1055 (D.C. Cir. 2003) (citations omitted).  Pursuant to United States law and bilateral tax treaties (where applicable), however, "[U.S.] [t]axes on such income . . . may often be offset . . . by credits for taxes paid to foreign governments[.]" *Id.*

On May 25, 2023, Mr. Bruyea initiated this case by filing a tax refund complaint against Defendant, the United States.  ECF No. 1 ("Compl.").  He seeks a refund of federal income tax paid "for the taxable year ended December 31, 2015." *Id.* ¶ 4.  During that tax year, Mr. Bruyea was a resident of British Columbia, Canada.  *Id.* ¶ 10.  He paid nearly $2 million in taxes to Canada, and "claimed a foreign tax credit of $1,398,683 to offset the regular U.S. tax liability[.]" *Id.*  At the time, Mr. Bruyea "did not claim a foreign tax credit to offset the NIIT." *Id.* ¶ 11.

On November 7, 2016, Mr. Bruyea "filed an amended tax return (Form 1040X) with the Internal Revenue Service . . . claiming a refund of $263,523 by virtue of a foreign tax credit that offsets the NIIT[.]" Compl. ¶ 12.  In particular, Mr. Bruyea asserts he is entitled to a foreign tax credit "based on the provisions of Article XXIV" of the Convention between Canada and the United States of America with Respect to Taxes on Income and on Capital ("Canada Tax Treaty" or "Treaty").  Compl. ¶¶ 3, 12.[1]  The IRS rejected the refund claim, concluding that "the Canada Tax Treaty did not provide an independent basis for a foreign tax credit to offset the NIIT and that such a foreign tax credit is not allowed under U.S. statutory foreign tax credit rules." *Id.* ¶ 13.

When Mr. Bruyea failed to convince the IRS, he "invoked the 'Simultaneous Appeal Procedure' pursuant to which he sought the opinions of the U.S. and Canadian competent authorities to resolve a situation in which double taxation is present (*i.e.*[,] Canadian income tax and U.S. NIIT on the same items of income and gain with no foreign tax credit offset available)."  Compl. ¶ 15.  The Canadian tax authority agrees with Mr. Bruyea.  ECF No. 18-6 ("The position of the Canadian competent authority in this regard is that Canada, as the country of source, has the right to tax the gain, while the US,

---

[1] The Treaty — also referred to as a "convention" — was originally signed on September 26, 1980, and subsequently amended via various Protocols between 1983 and 2007.  The parties agree that none of the amendments impact the original Treaty provisions that are at issue in this case.

as the country which has residual taxation rights, must provide relief in accordance with Article XXIV of the Convention."). Following the IRS's denial of his tax refund claim, Mr. Bruyea filed his complaint in this Court, asserting that "he is entitled to a refund of the NIIT that he paid in the amount of $263,523 for the 2015 tax year." Compl. ¶ 21.

On February 14, 2024, Mr. Bruyea moved for partial summary judgment, arguing that "he is entitled to a foreign tax credit for his 2015 tax year under the terms of [the Canada Tax Treaty]." ECF Nos. 18 at 1; 18-1 (collectively, "Pl. MSJ").[2] The government filed a cross-motion for summary judgment and response in opposition to plaintiff's motion. ECF No. 24 ("Def. MSJ").[3] Each party filed a reply brief. *See* ECF No. 22 ("Pl. Rep."); ECF No. 26 ("Def. Rep.").

On September 19, 2024, this Court held oral argument on the parties' motions. ECF No. 28 ("Tr.").

## II.    JURISDICTION

Neither party disputes this Court's jurisdiction to decide this case. Nevertheless, this Court has an independent responsibility to confirm its jurisdiction. *See* Rule 12(h)(3) of the Rules of the United States Court of Federal Claims ("RCFC"). This Court finds that it has jurisdiction pursuant to 28 U.S.C. § 1491(a) and 26 U.S.C. ("I.R.C.") § 7422.[4] *See Christensen v. United States*, 168 Fed. Cl. 263, 297 (2023) (concluding that 26 U.S.C. § 7422(f)(1) "expressly provides an exception to the jurisdictional bar on treaty-based claims" otherwise contained within 28 U.S.C. § 1502).[5]

---

[2] Citations to specific page numbers within electronic filings are to the ECF-stamped page numbers in the header of the filed PDF.

[3] The government initially filed a cross-motion for summary judgment and response in opposition to plaintiff's motion on March 29, 2024. ECF No. 20. The government subsequently moved to file a corrected version of its motion and response, ECF No. 23. This opinion refers only to the government's corrected filing, ECF No. 24.

[4] Title 26 of the United States Code is the Internal Revenue Code, and is often abbreviated or cited as "I.R.C."

[5] "While 28 U.S.C. 1346(a)(1) mentions the Court of Federal Claims in the course of conferring jurisdiction on district courts, it is not the source of the Court of Federal Claims' jurisdiction over tax refund cases; rather, such jurisdiction is based on 28 U.S.C. § 1491, which pre-dated section 1346(a)(1)." *Topsnik v. United States*, 120 Fed. Cl. 282, 286 n.3 (2015) (citing *Ferguson v. United States*, 118 Fed. Cl. 762, 763 n.2 (2014)). In *Gaynor v. United States*, 150 Fed. Cl. 519, 530 (2020), the undersigned wrote that "I.R.C. § 7422(a) provides this Court with jurisdiction (pursuant to the Tucker Act) to decide claims seeking a refund of taxes or penalties the IRS collected." More

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  RCFC 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  *Id.* at 250.  "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration."  *Silver State Land LLC v. United States*, 155 Fed. Cl. 209, 212 (2021) (quoting *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003)); *see also Lippmann v. United States*, 127 Fed. Cl. 238, 244 (2016) ("The [RCFC 56] standard also applies when the Court considers cross-motions for summary judgment.").

In this case, both parties seek summary judgment as to liability, which reduces to a legal question regarding the proper interpretation of the Canada Tax Treaty and the I.R.C.  Def. MSJ at 50 (explaining that "the parties have reserved questions regarding the computation of a foreign tax credit until after the Court has resolved the parties' dispute regarding the availability of a foreign tax credit in any amount").  Given the absence of any disputed material fact regarding liability, this Court agrees with the parties that liability may be properly resolved as a matter of law on summary judgment.

### IV.    PRINCIPLES OF TREATY INTERPRETATION

Interpreting a treaty is similar to interpreting a statute or a contract.  Thus, "[t]he interpretation of a treaty, like the interpretation of a statute, *begins* with its text."  *Golan v. Saada*, 596 U.S. 666, 676 (2022) (emphasis added) (quoting *Abbott v. Abbott*, 560 U.S. 1, 10 (2010)).  Courts are further directed to consider a treaty's "text *and structure*," just like we must for a statute or contract.  *Water Splash, Inc. v. Menon*, 581 U.S. 271, 276 (2017)

---

accurately, however, that statute is a limit on this Court's jurisdiction but is not the source of it.  *See Barnes v. United States*, 2023 WL 4683550, at *1 (Fed. Cl. July 21, 2023) ("To invoke this Court's jurisdiction in a tax refund suit, a plaintiff must comply with 26 U.S.C. § 7422(a)[.]"); *but see Chicago Milwaukee Corp. v. United States*, 40 F.3d 373, 374 (Fed. Cir. 1994) (noting that plaintiff "brought suit under I.R.C. § 7422(a)" and that "Section 7422(a) waives the United States' sovereign immunity from refund suits, . . . provided the taxpayer has previously filed a qualifying administrative refund claim" (internal citation omitted)); *Grigsby v. United States*, 2018 WL 1417398, at *2 (Fed. Cl. Mar. 7, 2018) ("Pursuant to 26 U.S.C. § 7422(a), this Court has jurisdiction to entertain suits for tax refunds.").

(emphasis added) (discussing "[t]he text and structure of the Hague Service Convention"); *cf. Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts."). In that regard, courts follow "the maxim that the construction of *any legal document*—like a statute, contract or patent—should try to give meaning to every term in that document; otherwise, a lawyer or court will have erred by reading the chosen words of the document into oblivion." *Advanced Commc'n Design, Inc. v. Premier Retail Networks, Inc.*, 46 F. App'x 964, 980–81 (Fed. Cir. 2002) (emphasis added).[6]

When it comes to a treaty, however, there is a notable difference from other legal instruments: courts are encouraged to consider a treaty's purpose, as well as extrinsic evidence of the intent of the parties to the treaty. In that regard, "[b]ecause a treaty ratified by the United States is 'an agreement among sovereign powers,'" the United States Supreme Court has "also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 441 (2020) (quoting *Medellin v. Texas*, 552 U.S. 491, 507 (2008) (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996))).[7] Particularly "when a treaty provision is ambiguous," courts "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Water Splash*, 581 U.S. at 280 (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700 (1988)). Thus, "[t]he practice of treaty signatories counts as evidence of the treaty's proper interpretation, since their conduct generally evinces their understanding of the agreement they signed." *United States v. Stuart*, 489 U.S. 353, 369 (1989). The Supreme Court has also instructed that "[t]he 'opinions of our sister

---

[6] *Cf. Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 68 (D.D.C.) ("plain-meaning analysis . . . end[s] the matter . . . in the interpretation of contracts, judgments, and statutes"), *judgment entered*, 987 F. Supp. 2d 82 (D.D.C. 2013), *and aff'd sub nom. Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015).

[7] *See also Arizona v. Navajo Nation*, 599 U.S. 555, 567 (2023) ("[C]ourts must stay in their proper constitutional lane and interpret the law (here, the treaty) *according to its text and history*[.]" (emphasis added)); *Golan*, 596 U.S. at 679 ("Courts must remain conscious of th[e treaty's] purpose, as well as the [treaty's] other objectives and requirements[.]"); *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) ("As a general matter, a treaty is a contract, though between nations. Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent.") (cited with approval in *ZF Auto. US, Inc. v. Luxshare, Ltd.*, 596 U.S. 619, 634 (2022)).

signatories,' . . . are 'entitled to considerable weight.'" *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999) (quoting *Air France v. Saks*, 470 U.S. 392, 404 (1985)).

There is yet another, meta-principle that applies to treaty interpretation. A tax treaty, in particular, "should generally be 'construe[d] . . . liberally to give effect to the purpose which animates it' and . . . '[e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred[.]'" *Stuart*, 489 U.S. at 368 (quoting *Bacardi Corp. of America v. Domenech*, 311 U.S. 150, 163 (1940) (citations omitted)).

Our appellate court, the United States Court of Appeals for the Federal Circuit, has synthesized the Supreme Court's treaty interpretation principles as follows:

> In construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purposes of the treaty. . . . The judicial obligation is to satisfy the intention of both of the signatory parties, in construing the terms of a treaty.
>
> Unless the treaty terms are unclear on their face, or unclear as applied to the situation that has arisen, it should rarely be necessary to rely on extrinsic evidence in order to construe a treaty, for it is rarely possible to reconstruct all of the considerations and compromises that led the signatories to the final document. However, extrinsic material is often helpful in understanding the treaty and its purposes, thus providing an enlightened framework for reviewing its terms. However, "the ultimate question remains what was intended when the language actually employed . . . was chosen, imperfect as that language may be." *Great–West Life Assurance Co. v. United States,* 678 F.2d 180, 188, 230 Ct. Cl. 477 (1982).

*Xerox Corp. v. United States*, 41 F.3d 647, 652–53 (Fed. Cir. 1994) (citations omitted). In short, a Court "must 'examine not only the language, but the entire context of agreement.'" *Nat'l Westminster Bank, PLC v. United States*, 512 F.3d 1347, 1353 (Fed. Cir.

2008) (quoting *Great–West Life,* 678 F.2d at 183).[8]   In *Xerox Corp.,* the Federal Circuit specifically noted that it had "reviewed the [extrinsic] evidence[.]"  41 F.3d at 653.

Although the Supreme Court has often given "great weight" to the Executive Branch's interpretation of the treaty, *Sumitomo,* 457 U.S. at 184–85, more recently the Supreme Court has acknowledged that it has "never provided a full explanation of the basis for our practice of giving weight to the Executive's interpretation of a treaty."  *GE Energy,* 590 U.S. at 444.  And, in any event, binding Federal Circuit authority instructs us that "an agency's position merits less deference 'where an agency and another country disagree on the meaning of a treaty[.]'"  *Nat'l Westminster Bank,* 512 F.3d at 1358 (quoting *Iceland Steamship Co., Eimskip v. U.S. Dep't of the Army,* 201 F.3d 451, 458 (D.C. Cir. 2000)).  Moreover, the Federal Circuit "has declined to defer to Treasury's contemporaneous interpretation where it conflict[s] with the contemporaneous intent of the Senate."  *Id.* (citing *Xerox,* 41 F.3d at 653–57).

"A treaty, when ratified, supersedes prior domestic law to the contrary and is equivalent to an act of Congress."  *Xerox Corp.,* 41 F.3d at 658 (citing *United States v. Lee Yen Tai,* 185 U.S. 213, 220–22 (1902)).[9]   On the other hand, the "tacit abrogation of prior law will not be presumed and, unless it is impossible to do so, treaty and law must stand together in harmony."  *Id.*

Summarizing those interpretive principles is far easier than applying them.  The Court turns next to that task.

---

[8] *See also Nat'l Westminster Bank,* 512 F.3d at 1353 ("When construing a treaty, '[t]he clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" (quoting *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180 (1982)); *United Techs. Corp. v. United States,* 315 F.3d 1320, 1322 (Fed. Cir. 2003) ("The terms of a treaty are to be given their ordinary meaning in the context of the treaty, and are to be interpreted to best fulfill the purpose of the treaty." (citing *Xerox Corp.,* 41 F.3d at 652)).

[9] *See Bell v. Off. of Pers. Mgmt.,* 169 F.3d 1383, 1386 (Fed. Cir. 1999) ("[W]hen a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null."  (quoting *Breard v. Greene,* 523 U.S. 371, 376 (1998))); *see also Akins v. United States,* 551 F.2d 1222, 1229 (C.C.P.A. 1977) ("As a rule of priority between equals, a later dated statute in direct conflict with a treaty supersedes the treaty.").

## V.    DISCUSSION

### A.  The Canada Tax Treaty

The primary locus of the parties' dispute within the Treaty is Article XXIV, notably entitled "***Elimination*** of Double Taxation."  Canada Tax Treaty, ECF No. 18-2 at 24 (emphasis added).  Paragraph 1 of Article XXIV provides, in relevant part:

> In the case of the United States, **[1]** subject to the provisions of paragraphs 4, 5 and 6, double taxation shall be avoided as follows:  **[2]** In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time **[3]** without changing the general principle hereof), **[4]** the United States shall allow to a citizen or resident of the United States . . . as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada . . . .

*Id.*  (For ease of reference, the Court has inserted bracketed numbers to mark operative phrases within Paragraph 1 of Article XXIV, above; hereafter, the words "Clause" or "Clauses" followed by bracketed number(s) refers to the marked phrases.  Clause [2] is referred to as the "U.S. Law Limitation.")

Paragraph 4 of Article XXIV provides:

> Where a United States citizen is a resident of Canada, the following rules shall apply:
>
> (a) Canada shall allow a deduction from the Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income or gains which arise (within the meaning of paragraph 3) in the United States, except that such deduction need not exceed the amount of the tax that would be paid to the United States if the resident were not a United States citizen; and
>
> (b) for the purposes of computing the United States tax, *the United States shall allow as a credit against* **United States tax**

> *the income tax paid or accrued to Canada* after the deduction referred to in subparagraph (a).  The credit so allowed shall not reduce that portion of the United States tax that is deductible from Canadian tax in accordance with subparagraph (a).

Canada Tax Treaty at 25 (emphasis added).

The Treaty, in turn, defines "United States tax" as "the taxes referred to in *Article II* (Taxes Covered) . . . that are imposed on income by the United States."  Canada Tax Treaty at 3 (Art. III ("General Definitions"), ¶ 1(d)).  And Article II provides that the Treaty "shall apply to taxes on income . . . imposed on behalf of each Contracting State, *irrespective of the manner in which they are levied.*"  *Id.* at 2 (Art. II, ¶ 1) (emphasis added).  Article II further provides that "the taxes existing on March 17, 1995 to which the Convention shall apply are . . . in the case of the United States, the Federal income taxes imposed by the Internal Revenue Code of 1986."  *Id.* (Art. II, ¶ 2(b)).  The parties also clearly anticipated future changes to their respective tax codes, with the Treaty specifying that "[t]he Convention shall apply also to . . . any taxes identical or *substantively similar* to those taxes to which the Convention applies under paragraph 2 [of Article II]."  *Id.* at 3 (Art. II, ¶ 3(a)) (emphasis added).

## B.  The NIIT

Chapter 2A of the I.R.C. covers the "Unearned Income Medicare Contribution."  It contains but a single provision: 26 U.S.C. § 1411 ("Imposition of tax").  That tax provision imposes an income tax on individuals as follows:

> **(1) Application to individuals.**--In the case of an individual, there is hereby imposed (in addition to any other tax imposed by this subtitle) for each taxable year a tax equal to 3.8 percent of the lesser of--
>
> **(A)** net investment income for such taxable year, or
>
> **(B)** the excess (if any) of-- **(i)** the modified adjusted gross income for such taxable year, over **(ii)** the threshold amount.

26 U.S.C. § 1411(a).

### C. The Crux of the Interpretive Problem

According to Mr. Bruyea, the Treaty in Article XXIV, Paragraph 1 — and particularly Clause [4] of that paragraph — creates a Treaty-based tax credit applicable to the NIIT irrespective of whether the I.R.C. provides for, or permits, that credit. Three textual data points support his view. First, Article XXIV's purpose, as indicated by its title, is the "Elimination of Double Taxation." Canada Tax Treaty at 24; *see also* Pl. MSJ at 20.[10] Second, Clause [4] expressly provides that "the United States shall allow to a citizen . . . of the United States . . . as a credit against the *United States tax* on income the appropriate amount of income tax paid or accrued to Canada[.]" Canada Tax Treaty at 24 (emphasis added). The government does not dispute that the NIIT qualifies as a "United States tax" as defined in Article II and Article III of the Treaty. *See* Canada Tax Treaty at 2-3. Third, Mr. Bruyea points to Paragraph 4(b) of Article XXIV, which provides that "for the purposes of computing the United States tax, the United States shall allow as a credit against *United States tax* the income tax paid or accrued to Canada after the deduction referred to in subparagraph (a)." *Id.* at 25 (emphasis added).

In opposing Mr. Bruyea's reading, the government relies primarily on the U.S. Law Limitation (*i.e.*, Clause [2] of Article XXIV, ¶ 1). *See* Def. MSJ at 12, 25, 32. According to the government, any Treaty-based credit — whether based on Paragraphs 1 or 4 of Article XXIV — must be "[i]n accordance with the provisions . . . of the law of the United States[.]" Canada Tax Treaty at 24. Put differently, the government maintains that a Treaty-based credit simply cannot exist independently of the I.R.C.— the "law of the United States." *Id.* The government further points out, Def. MSJ at 35, that Clause [2] specifically anticipates that the law of the United States "may be amended from time to time," thus extending the reach of the U.S. Law Limitation to future I.R.C. provisions that conflict with the Treaty.

Applying the U.S. Law Limitation to the facts of this case, the government contends that the NIIT — or, more accurately, the NIIT's placement outside of I.R.C. Chapter 1 — precludes the Treaty-based tax credit Mr. Bruyea claims. In particular, the government points to I.R.C. § 27, which provides that "[t]he amount of taxes imposed by foreign countries . . . shall be allowed as a credit against the tax imposed *by this chapter* to the extent provided in section 901[.]" 26 U.S.C. § 27 (emphasis added). Section 27 is in Chapter 1 of the I.R.C.[11] The NIIT, 26 U.S.C. § 1411, resides by its lonesome in Chapter 2A.

---

[10] Clause [1] instructs that "double taxation shall be avoided." Canada Tax Treaty at 24.

[11] I.R.C. § 901 is also contained within Chapter 1 of the I.R.C., and references "the tax imposed by

Because the I.R.C. provides that a foreign tax credit is only available for taxes within Chapter 1, and because the NIIT is outside of Chapter 1, the government argues that Mr. Bruyea cannot claim a Treaty-based foreign tax credit against the NIIT.

There is yet more textual complexity. Because the Treaty guarantees that any future amendment to United States law will not "chang[e] the general principle hereof," Canada Tax Treaty at 24 (Clause [3]), the government arguably cannot rely on the mere (later) location of the NIIT, within I.R.C. Chapter 2A, to preclude a Treaty-based credit. *See* Pl. MSJ at 37-39. Mr. Bruyea further asserts the "general principle hereof" refers to the Treaty's goal of eliminating (or avoiding) double taxation. *Id*.

By now, the basic interpretive problem is readily apparent. On the one hand, the Canada Tax Treaty plainly provides for a foreign tax credit in Mr. Bruyea's favor. *See* Canada Tax Treaty at 24–25 (Article XXIV, ¶ 1, Clause [4]; Article XXIV, ¶ 4(b)). On the other hand, a literal reading of the U.S. Law Limitation arguably takes back what Article XXIV otherwise giveth (because the I.R.C., by its terms, certainly does *not* provide for the Treaty-based tax credit Mr. Bruyea claims).

If Mr. Bruyea's refund claim were based only on the I.R.C., even he concedes that he would surely be out of luck. That is, Mr. Bruyea agrees with the foundational axiom that the I.R.C. does not provide the foreign tax credit he seeks to apply against the NIIT. He argues, however, that the I.R.C. cannot — and does not — answer the critical interpretative question posed by his complaint: "As the NIIT falls outside [C]hapter 1 [of the I.R.C.], the parties agree that no credit is allowed under domestic law, but Plaintiff's view is that the NIIT is covered by the foreign tax credit rules of the Canada Treaty." Pl. MSJ at 18. In other words, according to Mr. Bruyea, the government's position simply begs the question whether the Treaty independently provides a tax credit against the NIIT *notwithstanding* that the I.R.C. does not provide for such a credit.

More significantly, the government's interpretation has a glaring consistency problem: ***the government takes an ad-hoc approach to the U.S. Law Limitation***. The government interprets the U.S. Law Limitation differently when applied to different paragraphs within Article XXIV. In fact, as the Court details below, the government concedes that there are Treaty provisions that the government must follow even though

this chapter[.]"   More specifically, § 901 is within Subpart A ("Foreign Tax Credit") of Part III ("Income From Sources Without the United States") of Subchapter N ("Tax Based on Income From Sources Within or Without the United States").

they are inconsistent with the I.R.C.  That is a powerful concession in Mr. Bruyea's favor because if there are such Treaty provisions, how does the U.S. Law Limitation work?  How can the government ask this Court to read the U.S. Law Limitation to apply to some paragraphs of Article XXIV but not others?  On the other hand, Mr. Bruyea must contend with the meaning of the U.S. Law Limitation.

The Court grapples with these questions *infra*, but no matter how the interpretive problem is sliced, once a literal, expansive reading of the U.S. Law Limitation is off the table, resorting to extrinsic evidence is all but unavoidable.  Accordingly, this Court first addresses the plain text of the various Treaty and I.R.C. provisions at issue, and then explores the extrinsic material — all through the lens of the treaty interpretation principles set forth in the binding Supreme Court and Federal Circuit decisions this Court summarized above.  At the end of the day, the Court concludes that Mr. Bruyea has the better case.

### D.  The Canada Tax Treaty Provides the Tax Credit Mr. Bruyea Claims

Consistent with the case law, both parties extensively rely on extrinsic evidence,[12] suggesting that neither party can throw a knock-out interpretive punch here.  And the Court agrees: neither the Treaty nor the I.R.C. supplies a truly definitive answer — via the text's plain meaning — to the central issues in this case.  More specifically, the Canada Tax Treaty contains no language that *expressly* answers the twin questions of:  (1) whether "the NIIT is covered by the foreign tax credit rules of the Canada Treaty[,]" as Mr. Bruyea asserts, Pl. MSJ at 18; or (2) whether the U.S. Law Limitation precludes such a Treaty-based credit, as the government argues, Def. MSJ at 32.

But that does not mean this Court may disregard the Treaty's plain language or that it is unhelpful.  To the contrary, this Court begins with the Treaty's plain language and fleshes it out by first considering points of common ground.  Once we have a clear view of what the parties agree upon, the points of disagreement are sharpened into focus.  Only then does the Court consider the extrinsic evidence upon which the parties rely.

---

[12] *See, e.g.*, Pl. MSJ at 36 (citing the Canadian government's interpretation of the Treaty and the Technical Explanation to the Canada Treaty); Def. MSJ at 37 (citing to the United States Treasury Department's guidance on the NIIT).

Ultimately, this Court concludes that Mr. Bruyea's interpretive approach places less strain on the Treaty's text than the government's interpretation, and that his approach finds greater support within the extrinsic evidence.

### 1. The textual evidence favors Mr. Bruyea's interpretation of the Treaty

At the outset, the government concedes[13] that a treaty generally *may* provide a self-executing tax credit (*i.e.*, even where the I.R.C. contains no implementing provisions or even where it is inconsistent with a treaty-based tax credit). In that regard, the government agrees that, in a hypothetical case, "the treaty would have effect, *notwithstanding the Code*, unless the treaty was *later* amended by a code provision providing *directly to the contrary*[.]" Tr. 4:7–17 (emphasis added). This gets us quickly to the very heart of the textual dispute in this case because that is precisely what Mr. Bruyea contends Paragraphs 1 and 4 of Article XXIV accomplish here:

> **THE COURT:** … [M]y first question when we began is that it's possible for the treaty to have a self-executing credit, even if the Code didn't expressly provide for it.
>
> **[GOVERNMENT COUNSEL]:** Yes.
>
> **THE COURT:** I think that's kind of Plaintiff's [central] position[:] . . . the Treaty gives us the credit and nothing in the Code takes it away.
>
> **[GOVERNMENT COUNSEL]:** Well, I think the Code *takes it away* by putting the [NIIT] outside of Chapter 1 [of the I.R.C.].

Tr. 22:8–18 (emphasis added).

---

[13] *See ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1352, 1361 (Fed. Cir. 2021) (quoting a concession by counsel at oral argument as evidence a plaintiff fell short of its burden); *Faiella v. Fed. Nat'l Mortg. Ass'n*, 928 F.3d 141, 146 (1st Cir. 2019) ("A party ordinarily is bound by his representations to a court and — having staked out his position in response to the district court's inquiry — the appellant cannot now repudiate that position." (citation omitted)); *United States v. Lloyd*, 10 F.3d 1197, 1209 (6th Cir. 1993) (concession made by defendant's attorney in district court was binding on appeal); *Adidas Sportschuhfabriken ADI Dassler KG v. Chen*, 1988 WL 1091940, at *7 (N.D. Cal. Feb. 2, 1988) (concluding that a court "is entitled to rely upon and enforce the representations of counsel" because "the Court system would soon fail to function were the Court not able to rely upon representations and stipulations of counsel acting on behalf of their clients.").

The government thus agrees that United States law need ***not*** expressly implement a Treaty-based tax credit for one to exist. Rather, a Treaty-based credit can be "self-executing." *Id.* And we see that the government further concedes, albeit implicitly, that the Treaty here *does* generally create a Treaty-based tax credit. Otherwise, there would be nothing for the Code to "take[] away." *Id.* Finally, according to the government, the Treaty-based tax credit claimed here — that is, *as applied to the NIIT* — is precluded not by any express I.R.C. text *per se*, but rather by the NIIT's placement outside of I.R.C. Chapter 1.

Because the NIIT's statutory terms are silent about not only foreign tax credits generally, but also about Mr. Bruyea's putative Treaty-based credit in particular, the critical question is this: may this Court infer that any Treaty-based tax credit against the NIIT is precluded based upon its placement outside of Chapter 1 of the I.R.C.?

To answer that question, we first must understand that the Treaty, as a matter of law, will give way to the I.R.C. in only two circumstances. The first is where a later-enacted statutory provision "directly" conflicts with the Treaty. Tr. 4:15–17. That "last-in-time rule" is a background, bedrock legal principle of treaty interpretation. The second circumstance is where the Treaty, by its terms, defers to the I.R.C. The government asserts both grounds in arguing that this Court should reject Mr. Bruyea's tax claim.[14] The Court addresses each issue, in turn.

### a. The "last-in-time rule" does not apply here

A later-enacted statute controls over a *directly conflicting* treaty provision. *Bell*, 169 F.3d at 1386. This is known as the "last-in-time rule." *Kappus*, 337 F.3d at 1057 ("When a statute conflicts with a treaty, the later of the two enactments prevails over the earlier under the last-in-time rule." (discussing *Whitney v. Robertson*, 124 U.S. 190, 194-95 (1888)); *Whitney*, 124 U.S. at 195 ("The duty of the courts is to construe and give effect to the latest expression of the sovereign will."). Moreover, Congress has codified, in 26 U.S.C. § 7852(d)(1), the "last-in-time principle as applied to tax treaties and statutes." *Kappus*, 337 F.3d at 1057 (discussing 26 U.S.C. § 7852(d)(1)). Here, the parties do not dispute that

---

[14] Def. MSJ at 31 ("Because the tax imposed by § 1411 on net investment income is not a Chapter 1 tax, the text and structure of the Code make clear that foreign tax credits are not allowed against it."); *id*. at 32 ("Thus, to allow a credit against the NIIT would not be '[i]n accordance with the provisions . . . of the law of the United States,' and would contravene both the Code and the text of paragraph (1).").

the NIIT was enacted after the operative Treaty provisions on which Mr. Bruyea relies to support his claim. But the "last-in-time rule" only has significance if the NIIT indeed conflicts *directly* with the treaty. The government's mere talismanic invocation of the "last-in-time rule" does not mean it is applicable or that it resolves the salient question.

Now, Mr. Bruyea concedes that if Congress had enacted a later statute that *expressly* precluded any foreign tax credit — or any Treaty-based credit — from being applied to the NIIT, such a provision would control over the Treaty, and he would not have a viable claim here. Pl. MSJ at 24 ("Later enacted statutes can override a treaty if Congress intends to do so, but . . . Congress did not intend an override when enacting the NIIT."). In other words, such a hypothetical statute would control even if the Treaty lacked the U.S. Law Limitation (contained within Art. XXIV, ¶ 1, Clause [2]). That, of course, necessarily means that the U.S. Law Limitation is completely irrelevant to the "last-in-time rule," which, again, is a background rule that would apply even if the Treaty did not contain the U.S. Law Limitation. We can thus put the U.S. Law Limitation to the side for now and concentrate solely on whether the "last-in-time rule" applies here in some dispositive way.

The first major problem for the government's argument, according to Mr. Bruyea, is that "[b]ecause there has not been an explicit Congressional override, long-established case law requires that the NIIT and the Canada Treaty should be read harmoniously to give effect to both." Pl. MSJ at 25. Mr. Bruyea is correct. This Court must attempt to harmonize Treaty and statutory provisions: "Where a treaty and a statute 'relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either.'" *Kappus*, 337 F.3d at 1056 (quoting *Whitney*, 124 U.S. at 194, and citing *Xerox Corp.*, 41 F.3d at 658)).

In *Kappus*, the United States Court of Appeals for the District of Columbia Circuit declined to attempt to harmonize the Canada Tax Treaty with 26 U.S.C. § 59(a)(2), the statute at issue in that case. 337 F.3d at 1056. There, the D.C. Circuit acknowledged that "[t]he question of whether the Treaty and statute can be harmonized as the government suggests is an extremely close one." The court concluded, however, that "[i]t is not . . . a question that [the court] need resolve" because the plaintiffs *conceded* that the Treaty and statute were in "irreconcilable conflict" — indeed, the plaintiffs "contend[ed] that harmonization is not possible" — and the D.C. Circuit found that the statute was last in time. *Id.*

Mr. Bruyea does not concede the "irreconcilable conflict" point here and he is correct not to do so. Because neither the NIIT nor any other I.R.C. provision *expressly* precludes the application of the Treaty-based tax credit Mr. Bruyea claims, this Court further agrees with Mr. Bruyea that we can dispense with the "last-in-time rule" on that basis alone. Simply put, the fact that the I.R.C. provides for foreign tax credits only in Chapter 1 does not *expressly* preclude the Treaty's serving as an independent source for such a credit against the NIIT (*i.e.*, just because the NIIT is located elsewhere within the I.R.C.).

Again, if Congress, after the Treaty's ratification, had enacted a provision mandating that "the NIIT shall not be subject to any foreign tax credit," this case would be over (and decisively so, in favor of the government). But this Court cannot *infer* such a meaning or result — and read the I.R.C. as if such express language exists — merely because the NIIT was placed in a separate chapter of the IRC. *See, e.g.*, *Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed."); *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) ("There is, first, a firm and obviously sound canon of construction against finding implicit repeal of a treaty in ambiguous congressional action." (citing *Cook*, 288 U.S. at 120, amongst other cases)); *In re Rath*, 402 F.3d 1207, 1219 (Fed. Cir. 2005) (Bryson, J., concurring) (applying *Cook*).

In *Trans World Airlines*, the Supreme Court explained that "[l]egislative silence is not sufficient to abrogate a treaty." 466 U.S. at 252 (citing *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982)). There, the Supreme Court concluded that "[n]either the legislative histories of the Par Value Modification Acts, the history of the repealing Act, nor the repealing Act itself, make any reference to the [treaty]" at issue in that case. *Id.* To the contrary, explained the Court, the legislation at issue "was unrelated to the [treaty]." *Id.* The same is true in this case. The government has pointed to no express textual or extrinsic evidence — literally, nothing — even remotely suggesting that Congress's placement of the NIIT outside of Chapter 1 was intended to preclude a Treaty-based tax credit. *See* Def. MSJ at 23-24. Nor does any such evidence likely exist.[15]

---

[15] *See* Ausher M.B. Kofsky & Bryan P. Schmutz, *What a Long Strange Trip It's Been for the 3.8% Net Investment Income Tax*, 78 Md. L. Rev. Online 14, 31 (2019) ("In summary, the NIIT arose as a last-minute revenue replacement to offset the revenue loss from Congress's delayed implementation of the 40% excise tax on high-cost . . . health insurance plans.").

In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, the Supreme Court contrasted, in the context of a treaty, "an exception to arbitrability grounded in *express congressional language*" with "a judicially implied exception." 473 U.S. 614, 639 n.21 (1985) (emphasis added). The Court reasoned that it was "[d]oubtless" that "Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention" at issue in that case. *Id.* The Court declined, however, "to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not *expressly* directed the courts to do so." *Id.* (emphasis added). Here, as in *Mitsubishi*, there is no express direction for courts to disregard the Treaty-based tax credit Mr. Bruyea claims based on Congress's having placed the NIIT in its own chapter within the I.R.C. (*i.e.*, outside of Chapter 1).

In sum, there is nothing "expressly" (or even necessarily) inconsistent about the NIIT's placement and the Treaty-based credit Mr. Bruyea claims in this case. *Magone v. Heller*, 150 U.S. 70, 74 (1893) ("the adverb 'expressly,' in its primary meaning, denotes precision of statement, as opposed to ambiguity, implication, or inference, and is equivalent to 'in an express manner' or 'in direct terms[.]'"); *Express*, *Black's Law Dictionary* (12th ed. 2024) (defining "Express" as "Clearly and unmistakably communicated; stated with directness and clarity.").[16] This Court rejects the government's argument that "the placement [of the NIIT] is itself an express inconsistency" with the Treaty. Tr. 21:18–19.

The government's argument, however, is even more ambitious, rejecting the need for any specificity in the later-enacted provision to overrule the Treaty. According to the government, the general rule that "a Congressional intention to modify a treaty by statute must be clearly expressed" does not apply to tax cases; rather, the government asserts, "a different standard applies under the [Internal Revenue] Code." Def. MSJ at 42 n.20. In particular, the government points to 26 U.S.C. § 7852(d)(1), which provides that "[f]or purposes of determining the relationship between a provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status by reason of its being treaty or law."[17] The government thus asserts that "treaties have no preferential status over *tax* statutes, and there need be no explicit statement of

---

[16] An "express repeal" is a "[r]epeal by specific declaration in a new statute . . . ." *Repeal*, *Black's Law Dictionary* (12th ed. 2024).

[17] This provision was enacted as part of the Technical and Miscellaneous Revenue Act of 1998 ("TAMRA"), Pub. L. No. 100-647, 102 Stat. 3342.

Congressional intent that the Code will prevail in case of conflict with a treaty." Def. MSJ at 42 n.20 (citing S. Rep. No. 100-445 at 325-26 (1988)).

The government cannot get the mileage out of 26 U.S.C. § 7852(d)(1) it desires. As the D.C. Circuit recognized — citing the same Senate Report as the government here — "this provision was intended to codify the last-in-time principle as applied to tax treaties and statutes." *Kappus*, 337 F.3d at 1057. And, indeed, that is all the statute's plain language accomplishes. The government is wrong; tax statutes aren't different than other statutes vis-à-vis treaties.

To be clear, neither this Court nor Mr. Bruyea takes any issue with the "last-in-time" principle in general. The question is simply whether it applies here. The Court continues to answer that question in the negative. Because 26 U.S.C. § 7852(d)(1) does nothing more than codify the "last-in-time rule," as the D.C. Circuit recognized, the statute itself does nothing more than beg the question *whether there is, in fact, a necessary conflict* between the NIIT statute, on the one hand, and the Treaty, on the other. The government answers that question in the affirmative based on the NIIT's placement — and despite any textual evidence that its placement in Chapter 2A was intended to defeat the Treaty-based tax credit. Mr. Bruyea, in contrast, correctly points to the general rule that this Court should not manufacture a conflict between the statute and the Treaty by implication. That is precisely what this Court established *infra*, and 26 U.S.C. § 7852(d)(1) does not change this Court's analysis.

*Kappus* further demonstrates why the government is flat wrong. In that case, I.R.C. § 59(a)(2) — the tax statute at issue that conflicted with the Treaty — was subject to yet another TAMRA provision that specified that § 59(a)(2) was "intended to apply notwithstanding any inconsistent treaty obligations[.]" 337 F.3d at 1057 (discussing TAMRA, § 1012(aa)(2), codified at 26 U.S.C. § 861 note, and citing S. Rep. No. 100-45 at 319). According to the D.C. Circuit, "TAMRA thus made it crystal clear that Congress intended [§ 59(a)(2)] to supercede any preexisting treaty obligation with which it conflict[s]." *Id.* at 1058. Here, in contrast, the Treaty and the NIIT statute may be harmonized and, relatedly, there is no similar "crystal clear" congressional language like that in *Kappus*, indicating that the NIIT's placement was designed to "supercede" a Treaty-based tax credit.

Finally, if the government were correct that 26 U.S.C. § 7852(d)(1) somehow vitiates the Supreme Court's instruction that "a Congressional intention to modify a

treaty by statute must be clearly expressed[,]" Def. MSJ at 42 n.20, we would expect to see some clear authority to that effect. The government notably quotes no language from the Senate Report or *any* case law so holding. And that is because there is no support for the government's assertion. To the contrary, the D.C. Circuit in *Kappus* recognized — as does this Court — the continued vitality of the Supreme Court's general rule that "statutes and treaties should be harmonized if possible," even in tax cases. *Kappus*, 337 F.3d at 1059 n.7 (citing *Whitney*, 124 U.S. at 194, and the Federal Circuit's decision in *Xerox Corp.*, 41 F.3d at 658). Indeed, the D.C. Circuit instructed that "[t]he best way to harmonize § 59(a)(2) with [later-enacted] protocols [amending the Treaty] is to *assume the latter were not intended to repeal the former.*" *Id.* (emphasis added). And that is precisely how this Court approaches the NIIT. Moreover, this Court again notes that, quite unlike the plaintiffs in *Kappus*, Mr. Bruyea does not concede a conflict between the Treaty and a statute. Nor, for that matter, does the government point to language — "crystal clear," *id.* at 1058, or otherwise — making a conflict between the Treaty and the NIIT "irreconcilable," *id.* at 1056, or making them "absolutely incompatible," *id.* at 1059.

To side with the government, this Court would have to disregard the Federal Circuit's instruction in *Xerox Corp.* that "unless it is impossible to do so, treaty and law must stand together in harmony." *Kappus*, 337 F.3d at 1059 n.6 (quoting *Xerox Corp.*, 41 F.3d at 658). This Court has done its best to implement that instruction and the result favors Mr. Bruyea.

### b. The Treaty's U.S. Law Limitation does not preclude the application of a Treaty-based credit to the NIIT

But what about the second possibility: that the Treaty itself somehow precludes the application of a Treaty-based tax credit to the NIIT? The government argues that the Treaty's U.S. Law Limitation does precisely that. The fatal problem for the government is that the government simultaneously (and variously) contends that the U.S. Law Limitation means that the I.R.C. *always* trumps the Treaty and — try to wrap your head around this — that the Treaty *sometimes does* trump the I.R.C. The government cannot have it both ways. As demonstrated *infra*, the Court attempted during oral argument to pin the government down on the precise meaning and scope of the U.S. Law Limitation, but that proved to be "an effort to nail jello to a wall." *Alexander v. Mayhew*, 334 F.R.D. 626, 627 (N.D. Fla. 2020).

For starters, the government critically concedes that the U.S. Law Limitation does not *always* preclude a Treaty-based tax credit unless implemented in the I.R.C. Indeed,

the government agrees that the Treaty, *in Article XXIV, contains several paragraphs that control over conflicting United States statutory provisions*.  For example, the government readily agrees not only that Paragraph 3 of Article XXIV is inconsistent with the I.R.C., Tr. 13:5–17, but also that "Paragraphs 3, 4, 5, and 6 [of Article XXIV] *do* make promises that are inconsistent with the Code *and provide rights that would not otherwise be provided for under the Code*[.]"  Tr. 28:1–5 (emphasis added) (further agreeing that the "extrinsic materials that we refer to are quite specific about that").  In other words, computing taxes pursuant to Article XXIV, ¶¶ 3–6, would yield a different result than if the I.R.C. were followed instead.[18]

That critical concession creates an insurmountable impediment to the government's interpretive approach to the Treaty.  That is because whatever the proper scope of the Treaty's U.S. Law Limitation, the government agrees that it cannot be read literally to mean that the I.R.C. always trumps the Treaty.  And once we know that the Treaty contains *some* provisions that must be followed even though they conflict with United States law, the next, natural question is not rocket science:  *why is the Treaty-based tax credit Mr. Bruyea claims pursuant to Paragraphs 1 and 4 of Article XXIV any different than what is permitted in Paragraphs 3-6*?  The Court spent the bulk of oral argument trying to unravel the mystery of that question — *i.e.*, how the government can contend both that U.S. Law Limitation precludes Mr. Bruyea's claimed credit, but elsewhere permits Treaty provisions to trump the I.R.C.  There is no gentle way to say this — the government had the Court going in circles:

> **THE COURT:**  But doesn't this also – ["]the subject [to] the provisions and limitations of the law of the United States["] [language] apply to all the subsequent paragraphs?  Isn't this . . .  a general rule for . . . the double taxation compromise generally?
>
> **[GOVERNMENT COUNSEL]:**  It does, yes. . . . [E]xcept where the other [Treaty] paragraphs specifically trump specific provisions of the Code.

---

[18] *See* Pl. MSJ at 20 ("Article XXIV(5) provides a United States foreign tax credit to a Canadian resident United States citizen on dividends, royalties, and interest arising in the United States.  Under Code Sections 901 and 904(a), a foreign tax credit is only available with respect to foreign source income.  Thus, the credit under Article XXIV(5) of the Canada Treaty represents a credit that is not available under the Code and is independently provided by the Canada Treaty.").

Tr. 28:17–29:1 (cleaned-up).

But there are no Treaty paragraphs that "specifically" — *i.e.*, explicitly, by their terms — "trump specific provisions of the Code." *Id.* No such language exists. As hard as the Court tried to pin down precisely how the government reads the U.S. Law Limitation consistently across Article XXIV, the Court could not get the government to articulate a consistent approach:

> **THE COURT:** If we're putting aside *Whitney vs. Robinson*, [and focus just on the Treaty language] "in accordance with the provisions and subject to the limitations of the [law of the] United States," the Code should trump all of these other [Treaty] provisions that you are saying are enforceable, and I'm trying analytically to figure out how do you know that some of these provisions in the Treaty trump the Code and in other cases the Code trumps the Treaty?

> **[GOVERNMENT COUNSEL]:** Because the Treaty in its text specifically provides for remedies that are different from the remedies that are in the Code.

> **THE COURT:** So? Maybe the[] [Treaty provisions] just lose in the face of the Code.

> **[GOVERNMENT COUNSEL]:** Well, the Government is not taking such a draconian position in this case, Your Honor.

> **THE COURT:** Right, but it's an unprincipled one if I can't come up with a rule, an interpretive rule that explains your position in both cases, and it doesn't sound like I've got one.

> **[GOVERNMENT COUNSEL]:** The interpretive rule is that as a general matter, for any foreign tax credit that's allowed under the Treat[y], [it] is subject to the provisions and limitations of the Code except to the extent that elsewhere in the treaty there are specific provisions of the Code that are altered by the Treaty partners agreeing to do so in a particular [case].

Tr. 29:3–30:3 (cleaned-up).

The government's explanation in a nutshell amounts to this: the Treaty governs unless it doesn't.[19]

At best, a generous characterization of the government's position is that while there is no hard-and-fast rule, the Court should consider the relative specificity of competing Treaty and statutory provisions. At worst, the government concedes that its interpretation would nullify other paragraphs within Article XXIV, but the government knows that result would be absurd and so its only recourse is to arbitrarily adjust its interpretation of the U.S. Law Limitation depending on the paragraph at issue. When the Court pressed the government on just these problems, the government hypothesized a specificity distinction:

> **THE COURT:** It seems like that . . . "in accordance language,"
> works differently depending on what we're talking about.
> When we're talking about the other paragraphs with the . . .
> greater details on the three-bite [computation] rule, you agree

---

[19] Even if the U.S. Law Limitation must be read to apply to Paragraphs 3–6 of Article XXIV, and not just Paragraph 1 of that article, Mr. Bruyea still prevails. *See, e.g.,* Def. MSJ at 38 (arguing that the U.S. Law Limitation "applie[s] to the credits referenced in paragraph 4(b) [of Article XXIV] as well"); Tr. 40:5–9 (government arguing that "Paragraph 1 is, itself, subject to Paragraphs 4, 5, and 6, so there is an interlink between the two"). Indeed, the Court is inclined to agree with the government that Paragraph 1 of Article XXIV — including the U.S. Law Limitation — applies to any Treaty-based tax credit claim based on Paragraph 4. *See* Def. MSJ at 43. Thus, in contrast to *Christensen v. United States*, 168 Fed. Cl. 263, 330 (2023), the undersigned sees no reason to distinguish between the operative Treaty-based tax credit language in Paragraph 1 and that of Paragraph 4(b). Accordingly, the undersigned disagrees with *Christensen* that the U.S. Law Limitation applies in the former but not the latter. Instead, this Court concludes that the U.S. Law Limitation applies to both paragraphs, but they must be read together and are not expressly inconsistent with the I.R.C. What that means is that the U.S. Law Limitation does not preclude the Treaty-based foreign tax credit against the NIIT in either Paragraph 1 or 4(b). In that regard, *Christensen* itself concluded that there was "no evidence of congressional intent when placing I.R.C. § 1411 in Chapter 2A of the I.R.C.," 168 Fed. Cl. at 328, and that "nothing in the legislative history of the enactment of I.R.C. § 1411 indicates the congressional intent with respect to abrogating any foreign tax credit provided by" the nearly-identical tax treaty with France at issue in that case "when Congress enacted the [NIIT] in Chapter 2A[,]" *id.* at 331. Thus, in the undersigned's view, *Christensen* ultimately correctly rejected the government's request for "this court to *assume* from the words of [the NIIT] and its placement in Chapter 2A of the I.R.C. . . . that Congress intended to exclude the [NIIT] from all foreign tax credits." *Id.* at 331 (emphasis added). *Christensen* also is correct that I.R.C. § 6511(d)(3)(A) squarely supports the proposition "that a foreign tax credit may be allowed by the provisions of a treaty without also being provided by the terms of I.R.C. § 901." *Id.* at 332–33. In sum, the U.S. Law Limitation does not preclude Mr. Bruyea's claimed tax credit even if that clause applies to Paragraph 4(b) of Article XXIV.

that the Treaty provisions -- what is it called, the sourcing rules?

**[GOVERNMENT COUNSEL]**: Yes.

**THE COURT:** That trumps the Code.

**[GOVERNMENT COUNSEL]:** Yes.

**THE COURT:** Because they are inconsistent. All I'm asking you, if they are inconsistent with the Code, why does the Treaty provisions win there, but if I interpret the Treaty provision in Paragraph 1 to be what the Plaintiff is saying, it does not trump? That's what I'm asking.

**[GOVERNMENT COUNSEL]:** Because when the parties enacted Paragraph 1 of the Treaty, they were not expressly making a promise to alter the Code, whereas paragraphs 3, 4, 5, and 6 *contain express promises* to alter certain aspects of the Code.

**THE COURT:** Where is that? Where is the express promise that they are altering the Code? Is it just in their specificity?

**[GOVERNMENT COUNSEL]:** Yes.

Tr. 31:25–32:24 (cleaned-up) (emphasis added).

This Court rejects the government's specificity argument. As the Court discussed during oral argument, and holds now, there are no "express promises" — contrary to the government's assertion — that provide that the Treaty trumps the Code in Paragraphs 3, 4, 5, and 6 of Article XXIV, but not in Paragraph 1. To conclude otherwise, and to side with the government, would require conflating the words "express" and "inferred":

> **THE COURT:** Counsel, that is not what we mean when we say "express." "Express" means [something like] "notwithstanding any provision of the United States Code, we amend it as follows." You want me to infer [such language] from the specificity [of Article XXIV, ¶¶ 3-6], which then means we're just debating levels of specificity and what ought to govern when things aren't specific. It's a much different argument.

> **[GOVERNMENT COUNSEL]**: You are right that it does not say "notwithstanding the Code."
>
> **THE COURT:** Right. So it's not express. . . . Express means literal.
>
> **[GOVERNMENT COUNSEL]:** [The Treaty] creates rules that govern the application of foreign tax credits that are themselves inconsistent with the Code.
>
> **THE COURT:** Right. So why doesn't the Code win?
>
> **[GOVERNMENT COUNSEL]:** Because the parties . . . agreed to a provision . . . in the Treaty that differed from the Code . . . .
>
> **THE COURT:** So the Treaty wins, not the Code?
>
> **[GOVERNMENT COUNSEL]**: In that case, yes.
>
> **THE COURT:** Why?
>
> **[GOVERNMENT COUNSEL]**: Because that's what . . . the Treaty partners agreed to in the text of the Treaty[.]

Tr. 33:1–34:2 (cleaned-up).

In sum, the government's reading of the U.S. Law Limitation would simultaneously: (1) *preclude* Mr. Bruyea's claimed Treaty-based tax credit because it *putatively* conflicts with the I.R.C.'s foreign tax credit scheme in Chapter 1 of the I.R.C.; and (2) *permit* the computation of foreign tax credits in a manner that *definitely* conflicts with the I.R.C. This Court rejects the government's ad-hoc approach to the U.S. Law Limitation. Below, the Court further finds that other Treaty language supports Mr. Bruyea's claim in this case and addresses the meaning of the U.S. Law Limitation utilizing the relevant extrinsic evidence, per the treaty interpretation rules the Supreme Court and the Federal Circuit have instructed us to follow.

### c.  Other Treaty language supports Mr. Bruyea's claim

The government's interpretation fails to explain the proviso in Clauses [2] and [3] of Article XXIV, Paragraph 1, reserving to the United States the right to "amend[]" its laws "from time to time *without changing the general principle*" of the Treaty. Canda Tax Treaty at 24 (emphasis added). The government does not adequately explain what

"general principle" the Treaty is referencing, but it seems quite clear to the Court that the Treaty refers to the "general principle" of eliminating or avoiding double taxation.

The government opposes this view, but once again engages in circular, question-begging reasoning, asserting that "the general principle cannot be broader than the language it follows in [P]aragraph (1), which requires the United States to provide foreign-tax-credit relief in accordance with its own domestic law."  Def. MSJ at 35.  At oral argument, the government further asserted that "[t]he 'general principle' refers to the allowance of a credit under the Code[.]"  Tr. 18:11–12.  According to the government, this language is a "promise . . . that the United States will not repeal the foreign tax credit provisions from the Code.  That's what it promises."  Tr. 19:17–19.  But this reading critically assumes that the Treaty promised something impossible and, therefore, meaningless: to eliminate the "last-in-time rule."  Of course, the Treaty cannot preclude the government from later repealing foreign tax credit provisions within the I.R.C.  Moreover, the government's hypothesis about the meaning of the "general principle" language further critically assumes that a Treaty-based tax credit is precluded unless domestic law provides for it.  But the government already has conceded that: (1) nothing in our domestic law expressly precludes a Treaty-based tax credit *per se*; and (2) Article XXIV itself contains provisions that ***are*** inconsistent with domestic law.

The government makes no attempt to reconcile those concessions with its frankly incredible assertion that the U.S. Law Limitation means that the Treaty "does not necessarily provide U.S. taxpayers with rights beyond those already provided by the Code[.]"  Def. MSJ at 36 (arguing that "Article XXIV(1) of the Treaty need not provide rights to taxpayers beyond those in the Code").  In using the word "necessarily" without further explanation, the government confirms this Court's suspicion that the government is engaged in an *ad hoc* interpretation of the U.S. Law Limitation; it means whatever the government wants it to, depending on the paragraph.  And if the government is correct that the Treaty provides nothing "beyond . . . the Code," *id.*, the Treaty accomplishes… what, precisely?  The government's approach — that Paragraph 1 of Article XXIV may well give nothing beyond the I.R.C. — may render Article XXIV entirely inoperative,[20]

---

[20] *See* Tr. 17:17–23 ("**THE COURT:**  But if [Paragraph 1 of Article XXIV] were inconsistent with the Code, [the Treaty provision] would give nothing. . . . [I]t [would] really all come[] down to the Code.  The Code either provides for a credit or it doesn't.  **[GOVERNMENT COUNSEL]:** You are correct, Your Honor, that Paragraph 1 does not give anything beyond the Code….").  That is an inexplicable position, as a matter of basic textual interpretation principles, and one that is inconsistent, in any event, with the government's own concessions, as explained *supra*.

which is exactly what the government accuses Mr. Bruyea of doing to the U.S. Law Limitation.

Accordingly, this Court agrees with Mr. Bruyea: "If Defendant's position were accepted, it is hard to understand what Defendant contends is the purpose of Article XXIV(1). If this provision simply states that domestic law governs the allowance of a foreign tax credit, the article would have no independent purpose or effect in contravention of the fundamental rules of U.S. legal interpretation." Pl. MSJ at 38.

In any event, the Court does not read that "the general principle" language as "broader" than the U.S. Law Limitation, but rather as an interpretive rule to say this: *where the United States enacts a later tax code provision, the "general principle" of eliminating or avoiding double taxation should be effectuated* (*i.e.*, unless the "last-in-time rule" requires otherwise because there is a direct conflict). Indeed, if Congress wants to override treaty obligations where there is a possible inconsistency with a statute — as opposed to a direct conflict governed by the "last-in-time rule" — Congress knows how to do that. *See, e.g.*, 26 U.S.C. § 7874(f) ("Special rule for treaties.--Nothing in section 894 or 7852(d) or in any other provision of law shall be construed as permitting an exemption, by reason of any treaty obligation of the United States heretofore or hereafter entered into, from the provisions of this section."). The Court's approach avoids the government's *ipse dixit* and gives meaning to the "the general principle" phrase, which, in the Court's view, clearly refers to the principle of eliminating or avoiding double taxation — a principle that the government, contrary to the Treaty, entirely disregards.

Finally, the government admits that the Treaty's definition of "United States tax" includes the NIIT. Def. MSJ at 32 n. 13 ("Defendant does not disagree with plaintiff's position . . . that the NIIT is a 'covered tax' under Article II(3) of the Treaty."). Now, if anything is sufficiently specific from which the Court may draw a conclusion, *that* definition *is an express* provision that is at least as specific as Paragraphs 3-6 of Article XXIV and certainly far clearer than the inference the government wants this Court to draw from the placement of the NIIT outside of I.R.C. Chapter 1. Again, the Treaty also provides that it "shall apply also to . . . any taxes identical or *substantively similar* to those taxes to which the Convention applies under paragraph 2 [of Article II]." *Id.* at 3 (emphasis added) (Art. II, ¶ 3(a)). This language covers the NIIT and the government offers no response.

26

### 2. The extrinsic evidence supports Mr. Bruyea's interpretation of the Treaty

The government — contradicting its broad reading of the U.S. Law Limitation within Paragraph 1 — asserts that "[t]he fact that certain other provisions of the Treaty, such as Article XXIV(5), may in certain circumstances provide benefits to taxpayers that would not otherwise be allowed by the Code does not mean that the 'provisions' and 'limitations' language may be read out of [Article XXIV] paragraph (1)."  Def. MSJ at 34.

There are three problems with that argument.

First, the Court notes that the government once again concedes that Article XXIV *does* contain provisions that are binding and provide benefits to taxpayers even though they conflict with the I.R.C.

Second, the government's assertion is a strawman.  The government is correct that the U.S. Law Limitation must be given meaning, but we now know that it simply cannot be read as broadly as the government insists; at least not if the provision is going to have a consistent meaning throughout Article XXIV (given the government's own view of the Treaty provisions in Paragraph 3–6 of Article XXIV that the government agrees conflict with United States law).

Third, Mr. Bruyea's interpretation of the Treaty sits comfortably alongside the disputed U.S. Law Limitation language.  To explain how, we must refer, as both parties do, to the extrinsic evidence.  The extrinsic evidence not only generally supports Mr. Bruyea's claim to a Treaty-based tax credit but also provides a plausible answer regarding what the parties intended with the U.S. Law Limitation.

### a. The Technical Explanation

The Technical Explanation of the Treaty "is an official guide to the Convention" published by the Treasury Department.  *See* ECF No. 18-3 at 1 (Treasury Department Technical Explanation of the Convention Between the Government of the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington, D.C. on September 26, 1980, as Amended by the Protocol Signed at Ottawa on June 14, 1983 and the Protocol Signed at Washington on March 28, 1984).  Both parties rely on it.  Pl. MSJ at 36–37; Def. MSJ at 44–46.  It answers three critical questions.

First, what taxes does the Treaty cover?  The Technical Explanation of Article II indicates that the Treaty "shall apply . . . in the case of the United States, to the Federal income taxes imposed by the Internal Revenue Code."  ECF No. 18-3 at 2.  The Technical Explanation notes that the Treaty expressly excludes particular United States taxes, such as "the estate, gift, and generation-skipping transfer taxes, the Windfall Profits Tax, Federal unemployment taxes, social security taxes imposed under sections 1401, 3101, and 3111 of the Code, and the excise tax on insurance premiums imposed under Code section 4371."  *Id.*  More significantly — and consistent with the plain language of Article II, Paragraph 3 — the Technical Explanation makes clear that the Treaty may apply to future taxes no matter where they are located in the I.R.C.:

> Paragraph 3 provides that the Convention also applies to any taxes identical or *substantially similar to the taxes on income in existence on September 26, 1980* which are imposed *in addition to* or in place of *the taxes existing on that date*.  Similarly, taxes on capital imposed *after that date* are to be covered.

*Id.* at 3 (emphasis added); *see also id.* at 4 (addressing Paragraph 1(d) of Article III).  The Court once again notes that the government concedes that the NIIT is a "Federal income tax" and a "United States tax" as the Treaty defines those terms.  Def. MSJ at 32 n. 13 ("Defendant does not disagree with plaintiff's position (at 11-12) that the NIIT is a 'covered tax' under Article II(3) of the Treaty.").

Second, does Paragraph 1 of Article XXIV contain a mere truism that gives United States citizens nothing, as the government at times has suggested?  The Technical Explanation answers that question squarely in the negative: "Paragraph 1 provides the general *rules* that will apply under the Convention with respect to foreign tax credits for Canadian taxes paid or accrued."  ECF No. 18-3 at 37 (emphasis added).  The Technical Explanation clearly supports Mr. Bruyea's claim: "The United States undertakes to allow a citizen . . . of the United States . . . a credit against the Federal income taxes imposed by the Code for the appropriate amount of income tax paid or accrued to Canada."  *Id.*

Third, how should we read the critical language in the U.S. Law Limitation?  According to the Treasury Department, the parties intended something very specific:

> The direct and deemed-paid credits *allowed by paragraph 1* are subject to the limitations of the Code as they may be amended

28

> from time to time without changing the general principle of
> paragraph 1.  Thus, as is generally the case under U.S. income
> tax conventions, provisions such as Code sections 901(c), 904,
> 905, 907, 908, and 911 apply *for purposes of computing* the
> allowable credit under paragraph 1.  In addition, the United
> States is not required to maintain the overall limitation
> currently provided by U.S. law.

ECF No. 18-3 at 37 (emphasis added).

We learn several things from the Technical Explanation: (1) the Treaty, by its terms, covers the NIIT even though it was enacted later; (2) Paragraph 1 of Article XXIV itself contains "rules" and commits the United States to allowing its citizens credits "against the federal income taxes imposed by the [I.R.C.] for taxes paid to Canada"; (3) Paragraph 1 of Article XXIV contains no suggestion that it was intended to limit in any way the type of United States tax to which a foreign tax credit might apply; and (4) consistent with United States law, particular I.R.C. provisions may be appropriately utilized to compute the quantum of the tax credit.

Any remaining contention that a taxpayer is not entitled to any Treaty-based credit unless the I.R.C. provides for it is flatly refuted by the Technical Explanation in two different ways.

First, the Technical Explanation advises this:

> The term "income tax paid or accrued" is defined in
> paragraph 7 of Article XXIV to include certain specified taxes
> which are paid or accrued.  The Convention only provides a
> credit for amounts paid or accrued.  The determination of
> whether an amount is paid or accrued is made under the
> Code.  ***Paragraph 1 provides a credit for these specified taxes
> whether or not they qualify as creditable under Code section
> 901 or 903***.

ECF No. 18-3 at 37 (emphasis added).  Whatever is meant by "these specified taxes," it is perfectly clear the parties intended that Paragraph 1 ***of the Treaty*** "provides a credit"

even if those taxes do "not . . . qualify as creditable under [I.R.C.] 901 or 903." *Id.* This alone is a complete refutation of the government's overall position.

Second, the Technical Explanation refers to "[a] taxpayer who claims **credit under the Convention** for Canadian taxes **made creditable solely by paragraph 1**." *Id.* (emphasis added). This, too, is a QED in Mr. Bruyea's favor. The government does not address any of this language in its briefs.

Finally, the Technical Explanation indicates that "[t]he rules of Paragraph 1" of Article XXIV must be construed in concert with the "rules in paragraphs 4 and 5." ECF No. 18-3 at 43 ("The rules of paragraph 1 are modified in certain respects by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of Canada."). That is the government's position, *see supra* note 19, and, again, the Court takes no issue with that straightforward proposition. But the point yields the government no advantage as there is no suggestion that there is any limitation — in Paragraphs 4 and 5 — regarding the type of "United States tax" to which a Paragraph 1, 4, or 5 credit may apply. In other words, so long as the NIIT qualifies as a "United States tax," which the government concedes is this case here, the Treaty provides for the claimed credit.

### b. Other extrinsic evidence supports Mr. Bruyea's claim

The Letter of Submittal from the President to the United States Senate, seeking its "advice and consent to ratification," ECF No. 18-4 at 2, also supports Mr. Bruyea's case. The Transmittal Letter explains that the Treaty "contains a *rule* . . . for *eliminating double taxation* of United States citizens who are residents in Canada." *Id.* at 4 (emphasis added). The purpose of the Treaty — at least in the President's contemporaneous view — could not be clearer and we are instructed to take it into account. *Water Splash,* 581 U.S. at 281 (considering a report that the President included when transmitting a treaty to the United States Senate for consideration and explaining that "[t]he Court also gives 'great weight' to 'the Executive Branch's interpretation of a treaty'" (quoting *Abbott*, 560 U.S. at 15)). The Joint Committee on Taxation's explanation of the Treaty, ECF No. 18-5 ("JCT Explanation"), similarly explains that "[t]he *principal purposes* of the proposed income tax treaty between the United States and Canada is to reduce *or eliminate* double taxation of income earned by citizens and residents of either county from sources within the other country[.]" ECF No. 18-5 at 7 (emphasis added).

The JCT Explanation also clarifies that the Treaty provides for a foreign tax credit independent of the I.R.C., noting that "[t]he U.S. foreign tax credit *provided for by the treaty* is to be applied on a per-country basis: that is, Canadian taxes will only be permitted to offset U.S. tax imposed on Canadian income." *Id.* at 11 (emphasis added). Indeed, that "*contrasts* with the Code limitation which is computed on an overall, worldwide basis." *Id.* (emphasis added).

And here's another total refutation of the government's position from the JCT Explanation: "[T]he treaty's rules are used *only if the taxes are not creditable under the Code*." *Id.* (emphasis added). The JCT Explanation expressly acknowledges that the Treaty "will apply to substantially similar taxes *which either country may subsequently impose*." ECF No. 18-5 at 16 (emphasis added).

While the JCT Explanation *does* comment that "[t]he credit is provided . . . only to the extent permitted under domestic law[,]" that means that "[t]he credit is *to be computed* in accordance with the provisions of and subject to the limitations of U.S. law." ECF No. 18-5 at 40 (emphasis added). Note that this language contains the same phrase as the U.S. Law Limitation, upon which the government primarily relies, but is explained to reflect that it references computation, and not general allowability. This dovetails nicely, and is consistent, with the Technical Evaluation's referencing specific I.R.C. provisions that could be employed to compute the quantum of any Treaty-based credit (but that do not themselves nullify such a credit). Thus, in the same section, the JCT Explanation references the "use[] [of] the Treaty credit," *id.*, as well as a taxpayer's "claiming benefits under the treaty not available under the [I.R.C. ,]" *id.* at 40-41.

The JCT Explanation directly addresses Mr. Bruyea's claim and supports it: "The proposed treaty also contains special rules for U.S. citizens who are residents of Canada. . . . [T]he United States will allow the citizen a credit *against his U.S. tax for any tax paid to Canada* after Canda has allowed the credit for U.S. taxes." ECF No. 18-5 at 42 (emphasis added). Note the expansive language — "U.S. tax" without limitation — and the lack of any limitation based on the I.R.C.

Finally, the government relies on the Technical Explanation of the 2006 U.S. model treaty, Def. MSJ at 26 (discussing ECF No. 20-13), but that document also provides support for Mr. Bruyea. It notes that "the United States will allow a credit to its citizens and residents in accordance with the Article, *even if such credit were to provide a benefit not available under the [I.R.C.].*" ECF No. 20-13 at 6 (emphasis added).

### 3. Other interpretive principles support Mr. Bruyea's claim

As noted above, this Court must also account for Canada's view, as "[t]he 'opinions of our sister signatories,' . . . are 'entitled to considerable weight.'"  *El Al Israel Airlines,* 525 U.S. at 176 (quoting *Air France*, 470 U.S. at 404).  Here, Canada has indicated that Mr. Bruyea is entitled to the Treaty-based tax credit he seeks.  ECF No. 18-6 ("The position of the Canadian competent authority in this regard is that Canada, as the country of source, has the right to tax the gain, while the US, as the country which has residual taxation rights, must provide relief in accordance with Article XXIV of the Convention.").

The Supreme Court further instructs that "'where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred[.]'"  *Stuart*, 489 U.S. at 368 (quoting *Bacardi Corp.*, 311 U.S. at 163 (citations omitted)).  The Court sees no reason to disregard that principle here and it clearly favors Mr. Bruyea, just as it did the plaintiff in *Christensen*.  *See Christensen*, 168 Fed. Cl. at 333 (discussing *Stuart* and following the Supreme Court's instruction that a "liberal interpretation" of tax treaties is warranted).

### 4. Treasury's own regulatory explanations refute the government's policy-based objections

The government asserts that recognizing "a Treaty-based allowance of foreign tax credits against the NIIT would require the creation of a brand new, parallel, foreign-tax credit regime not contemplated by the Code[.]"  Def. MSJ at 56.  Thus, argues the government, "[t]he absence of any such methodology in the Code suggests strongly that Congress did not contemplate the application of foreign tax credits against the NIIT."  *Id.*  The government's objection, in essence, is that the precise methodology for calculating Mr. Bruyea's claimed credit is not clear in the I.R.C. and thus this Court should infer no such credit may be claimed.

For starters, the government already has agreed that this computational question may be decided after the entitlement issue the parties' motions for summary judgment presents for resolution.  Indeed, the computation problem is a non-issue at this stage of the case because "[t]he parties have agreed at this stage to defer any computation issues pending the outcome of this motion for partial summary judgment."  Pl. Rep. at 18 n.11; *see also* Def. MSJ at 50 (explaining that "the parties have reserved questions regarding the computation of a foreign tax credit until after the Court has resolved the parties' dispute regarding the availability of a foreign tax credit in any amount").

Moreover, the government's objection, by its own admission, is overblown.  In the final regulation implementing the NIIT, the Treasury Department and IRS agreed that there is no *per se* obstacle to a treaty-based credit applying to the NIIT:

> The Treasury Department and the IRS also received comments asking whether United States income tax treaties may provide an independent basis to credit foreign income taxes against the section 1411 tax.  The Treasury Department and the IRS do not believe that these regulations are an appropriate vehicle for guidance with respect to specific treaties.  An analysis of each United States income tax treaty would be required to determine whether the United States would have an obligation under that treaty to provide a credit against the section 1411 tax for foreign income taxes paid to the other country.

Net Investment Income Tax, 78 Fed. Reg. 72394-01, 72396, 2013 WL 6222406 (Dec. 2, 2013).  The clear and necessary implication is that a treaty-based credit *may* apply to the NIIT and, thus, that the NIIT's placement in Chapter 2A of the I.R.C. (*i.e.*, outside of Chapter 1) does not preclude a foreign tax credit.

The Court recognizes that the very same Federal Register commentary reads the U.S. Law Limitation as precluding "an independent basis for a credit against the section 1411 tax."  *Id.*  But particularly in the absence of any explanation of that assertion — persuasive or otherwise — that addresses the canons of treaty interpretation, the extrinsic evidence, and the other interpretive difficulties this Court analyzed above but which the government fails to answer, this Court declines to afford Treasury's view any deference.  *See, e.g., Loper Bright Enterprises v. Raimondo*, -- U.S. --, 144  S. Ct. 2244, 2266 (2024) (concluding that "agencies have no special competence in resolving statutory ambiguities" and that "[t]he Framers . . . expected that courts would resolve them by exercising independent legal judgment").  And to be clear, there are no actual regulatory provisions Treasury or IRS promulgated that address the issues in this case.

## VI.    REDUX

Given the relative complexity of the parties' contentions and arguments, the Court provides this basic summary of its decision:

1. The United States and Canada entered a tax treaty: the Convention between Canada and the United States of America with Respect to Taxes on Income and on Capital.

2. Based upon that Treaty, Mr. Bruyea claims he is entitled to a foreign tax credit to be applied against the NIIT he paid to the United States.

3. The Treaty provides in Paragraph 1 of Article XXIV that "the United States *shall allow* to a citizen or resident of the United States . . . *as a credit against the United States tax on income* the appropriate amount of income tax paid or accrued to Canada . . . ."

4. The Treaty similarly provides in Paragraph 4 of Article XXIV that "for the purposes of computing the United States tax, *the United States shall allow as a credit against* **United States tax** *the income tax paid or accrued to Canada*."

5. The government agrees that, in general, a taxpayer may claim a treaty-based foreign tax credit — *i.e.*, the I.R.C. does *not* have to implement a treaty-based tax credit for one to exist.

6. The government nevertheless argues that the I.R.C. only provides for foreign tax credits against income taxes contained within Chapter 1 of the I.R.C. Because Congress placed the NIIT in Chapter 2A of the I.R.C., no foreign tax credit may be applied against the NIIT. This is for two reasons: (a) because the NIIT was enacted after the Treaty, the NIIT's terms and placement in Chapter 2A trump the Treaty pursuant to the "last-in-time rule"; and (b) pursuant to the Treaty's terms, any Treaty-based foreign tax credit must be "[i]n accordance with the provisions and subject to the limitations of the law of the United States." In that regard, Mr. Bruyea agrees that the I.R.C. does not provide for the foreign tax credit he seeks.

7. The government's "last-in-time" argument fails because the Court is required to harmonize the Treaty and the I.R.C. where possible, and here it is possible to do so; the NIIT contains no text specifically and expressly inconsistent with the Treaty-based foreign tax credit language upon which Mr. Bruyea relies.

8. More importantly, the government concedes that Article XXIV of the Treaty contains several paragraphs that are incompatible with the I.R.C. but that are *not* trumped by the I.R.C. Thus, the government does not read the phrase "[i]n accordance with the provisions and subject to the limitations of the law of the United States" (the U.S. Law Limitation clause) to mean that Treaty provisions must be consistent with the I.R.C. to be enforceable. That phrase must be read

consistently across Article XXIV, but the government does not do so. Instead, the government sometimes applies it (*i.e.*, to preclude Mr. Bruyea's claimed foreign tax credit) and sometimes does not (*i.e.*, the government implements the credit calculation rules contained within Paragraphs 3-6, even though they are inconsistent with the U.S. Law Limitation). As a result, the Court rejects the government's overly-broad reading of that provision.

9. The parties in the Treaty defined "United States tax" in a manner that covers the NIIT and further agreed that "[t]he Convention shall apply also to . . . any taxes identical or *substantively similar* to those taxes to which the Convention applies under paragraph 2 [of Article II]." These Treaty terms support Mr. Bruyea's claim.

10. One purpose of the Treaty is to eliminate or avoid double taxation and Mr. Bruyea's interpretation best effectuates that purpose of the parties to the Treaty.

11. Mr. Bruyea's interpretation also better accounts for the extrinsic evidence, which substantiates that the parties contemplated Treaty-based foreign tax credits even where inconsistent with the I.R.C.

12. The U.S. Law Limitation clause is focused on how a Treaty-based credit is computed but not its existence. Thus, the Treaty may provide for a tax credit even where the I.R.C. does not otherwise effectuate that credit.

## VII.  CONCLUSION

For the foregoing reasons, Mr. Bruyea is entitled to partial summary judgment on the issue of entitlement to a Treaty-based foreign tax credit for his 2015 tax year. *See* RCFC 56. On or before January 16, 2025, the parties shall file a joint status report regarding how this case should proceed.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge